In the Matter of the **RATE APPEALS OF LYNGBLOMSTEN CARE CENTER and Camilia Rose.**

No. C1–97–1876.

Court of Appeals of Minnesota.

April 28, 1998.

Review Denied June 17, 1998.

Samuel D. Orbovbich and Thomas L. Skorczeski, Orbovich & Gartner, Chartered, St. Paul, for relators.

Hubert H. Humphrey III, Attorney General, and Robert V. Sauer, Assistant Attorney General, for respondents.

Considered and decided by SCHUMACHER, P.J., and HUSPENI and SHUMAKER, JJ.

## OPINION

SHUMAKER, Judge.

The Minnesota Department of Human Services (DHS) refused to reimburse relator nursing homes' capital repair and replacement costs under the repair and replacement provision of the Nursing Facility Rate statute. The Commissioner of Human Services granted DHS summary judgment. Relators seek review through writ of certiorari.

## FACTS

Relators Lyngblomsten Care Center and Camilia Rose Care Center are nursing home facilities that participate in Minnesota's Medical Assistance (MA) program. In 1993, both

facilities completed major construction projects that were approved under the nursing home moratorium process. Minn.Stat. § 144A.073 (1996). The legislature determined that a nursing home moratorium was necessary "to control nursing home expenditure growth." Minn.Stat. § 144A.071 (1996). A major construction project is one that "exceeds the lesser of $150,000 or ten percent of [the facility's] most recent appraised value." Minn.Stat. § 256B.431, subd. 16 (1996). Lyngblomsten's major construction project included a three-story addition, two elevators, and the remodeling of a lounge and two nursing stations at a cost of $1,234,223. Camilia Rose's major construction project was a 3,700 square foot addition to its building at a cost of $477,144.

Within 12 months of the major construction projects, relators made additional capital repairs and replacements to their facilities. During the year before the termination of Lyngblomsten's major construction project, it incurred costs of approximately $34,000 for light fixtures, carpeting, a nurse call system, a compressor, windows, elevator equipment, a cooler, and a heating filter system. Similarly, approximately four months after Camilia Rose completed its major construction project, it replaced a heating and cooling unit for its main building at a cost of approximately $26,000. These later repair and replacement costs were unrelated to and not a functional part of the major construction projects that had been approved for reimbursement.

DHS reimburses nursing facilities differently for a major construction project or for a capital repair or replacement. Relators applied to DHS for reimbursement of their major construction projects under the specific statutory provision for major construction projects, Minn.Stat. § 256B.431, subds. 16, 17 (1996). Relators also sought reimbursement of their unrelated capital repairs and replacements under a separate statutory provision, Minn.Stat. § 256B.431, subd. 15 (1996). The effect of relators' separation of costs, if DHS would have accepted them, would have been to obtain a greater total amount of MA reimbursement for their total costs.

During a desk audit, however, DHS disallowed relators' separation of costs. It adjusted the reported costs by adding the repair and replacement costs together with the major construction project costs. DHS's adjustment was based on a statutory definition of construction project. Because of DHS's action, relators did not receive reimbursement for their repairs under Minn.Stat. § 256B.431, subd. 15(e) (1996).

After DHS's desk audit adjustment, relators sought a contested case hearing before an administrative law judge (ALJ). The ALJ, on competing motions for summary judgment, recommended that the commissioner grant DHS's motion. The Commissioner of Human Services granted summary judgment to DHS. Relators obtained a writ of certiorari to this court, and we now review the commissioner's decision.

## ISSUE

Did DHS correctly combine relators' major construction project costs and their ordinary repair and replacement costs under Minn. Stat. §§ 144A.071 and 256B.431?

## ANALYSIS

■ This court independently reviews an agency's decision on a question of law or statutory interpretation. *Matter of Dougherty,* 482 N.W.2d 485, 488 (Minn.App.1992), *review denied* (Minn. June 10, 1992). However, "[w]hen the meaning of a statute is doubtful, courts should give great weight to a construction placed upon it by the department charged with its administration." *Krumm v. R.A. Nadeau Co.,* 276 N.W.2d 641, 644 (Minn.1979); *see also Estate of Atkinson v. Minnesota Dept. of Human Servs.,* 564 N.W.2d 209, 213 (Minn.1997) (citing *Krumm* ).

■ There are three statutory provisions at issue. The first defines nursing home capital repair and replacement cost reporting:

If costs otherwise allowable under this subdivision are incurred *as the result of* a project approved under the moratorium exception process in section 144A.073, or *in connection with* an addition to or re-

placement of buildings, attached fixtures, or land improvements for which the total historical cost of these assets exceeds the lesser of $150,000 or ten percent of the nursing facility's appraised value, these costs must be claimed under subdivision 16 or 17, as appropriate.

Minn.Stat. § 256B.431, subd. 15(e) (emphasis added).

The second provision instructs the department of health and human services to employ the definition of construction project found at Minn.Stat. § 144A.071, subd. 1a (g)(3) (1996). Minn.Stat. § 256B.431, subd. 10 (1996).[1]

The third provision defines the term "construction project" as "capital asset additions or replacements that are completed within 12 months before or after the completion date of the project described in clause (1)." Minn. Stat. § 144A.071, subd. 1a (g)(3) (1996).

There is no case law interpreting these provisions. Relators contend that the two phrases in section 256B.431, subdivision 15(e), "as a result of," and "in connection with," require DHS to find that the claimed capital repair and replacement costs are a function of or related to the major construction project before those costs could be added to the cost of a major construction project approved under the moratorium process. Relators' argument would be more compelling if subdivision 15(e) were read in isolation. The department, however, is charged with interpreting all relevant statutory provisions together. Because Minn.Stat. § 256B.431, subd. 15(e) has more than one reasonable interpretation, the statute presents an ambiguity and is subject to the rules of statutory construction. *See Tuma v. Commissioner of Econ. Sec.*, 386 N.W.2d 702, 706 (Minn.1986) (statute is ambiguous if it has more than one reasonable interpretation and court must apply rules of construction); *Waller v. Powers Dep't. Store*, 343 N.W.2d 655, 657 (Minn.1984) (statutory construction appropriate only when statute is ambiguous). The object of statutory construction is to determine and give effect to the legislature's intent. Minn.Stat. § 645.16 (1996).

Beginning with the desk audit and continuing to its argument on appeal, DHS has asserted that when section 144A.071, subdivision 1a (g)(3) is read in conjunction with section 256B.431, subdivision 15(e), the result is that the phrases in subdivision 15(e), "as a result of" and "in connection with," can be read to mean that any repair or replacement cost incurred within 12 months of a major construction project should be considered a part of the major construction project. The practical effect of DHS's interpretation serves to control nursing home expenditures. It is therefore consistent with the goals of the nursing home moratorium process. Minn.Stat. § 144A.071, subd. 1. DHS's interpretation is further entitled to "great weight" due to the ambiguous and technical nature of the statutes in question. *Krumm*, 276 N.W.2d at 644.

In addition, after applying canons of statutory interpretation, we are persuaded that DHS's interpretation is correct. Statutes are to be read to make the entire statute effective and certain. Minn.Stat. § 645.17(2) (1996). In this case, DHS's reading of sections 144A.071 and 256B.431 gives meaning to and makes effective all of the provisions brought into question by this case.

Canons of statutory interpretation also allow us to consider legislative history of ambiguous statutes to determine the legislature's intentions. *See* Minn.Stat. § 645.16 (1996) (legislative history can be considered in construing a statute); *A/AL, Inc. v. City of Faribault*, 569 N.W.2d 546, 547 (Minn.App. 1997). In 1993, a senate committee discussion addressed exactly the issue in this case. *Hearing on S.F. 1146 Before the Senate Committee on Health Care* (Apr. 8, 1993). Senator Berglin introduced what is now Minn.Stat. § 144A.071, subd. 1a (g). *Compare* Berglin's April 8, 1993 A–3 amendment to S.F. 1146 *with* Minn.Stat. § 144A.071, subd. 1a. Senator Finn unsuccessfully attempted to amend Senator Berglin's amendment to allow a nursing home that was undergoing a major construction project to also receive reimbursement for an unrelated capi-

---

1. Minn.Stat. § 256B.431, subd. 10 refers to Minnesota Rules, part 4655.1110 (Emergency). The legislature enacted Rule 4655.1110 into stat- ute in 1993. 1993 Minn. Laws 1st Spec. Sess. ch. 1, art. 5, § 2, 1993 (codified at Minn.Stat. § 144A.071, subd. 1a).

tal repair and replacement. *Hearing on S.F. 1146 Before the Senate Committee on Health Care* (Apr. 8, 1993). Senator Finn argued that it would be more cost effective to make ordinary repairs at the same time a major construction project was occurring instead of waiting a year and a day as proposed by Senator Berglin's A–3 amendment. *Id.* Senator Berglin and a representative from the department of health, however, testified that to allow such an exception would be inconsistent with the legislature's intention to control capital expenditure costs. *Id.* Senator Finn's amendment was not approved. Senator Berglin's amendment was approved by the committee and ultimately became Minn.Stat. § 144A.071, subd. 1a (g). 1993 Minn. Laws, 1st Spec. Sess. ch. 1, art. 5 § 2. We note that neither relators (despite the ALJ's and commissioner's reliance on this legislative history) nor this court found any evidence that contradicts the conclusions drawn from the April 8, 1993, committee hearing. We conclude, therefore, that the above committee discussion reasonably evinces the legislature's intent and, along with the above-cited reasons, precludes relators' argument.

We affirm the commissioner's decision because DHS's interpretation of ambiguous statutes is entitled to deference and because canons of statutory interpretation support DHS's interpretation.

## DECISION

Relator nursing homes that completed capital repairs and replacements within 12 months of major construction projects were not entitled to reimbursement of their capital repair and replacement costs under Minn. Stat. § 256B.431, subd. 15(e).

**Affirmed.**